**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| *In re* SUBPOENAS TO | ) | |
| Dr. Agnes Gereben Schaefer | ) | |
| | ) | |
| Served in related cases: | ) | Case No. _____ |
| | ) | |
| *Jane Doe 2, et al. v. Patrick M. Shanahan,* | ) | |
| *et al.*, D.D.C. Case No. 17-cv-1597-CKK | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| *Stone, et al. v. Trump, et al.*, D. Md. Case | ) | |
| No. 17-cv-02459-GLR | ) | |
| | ) | |
| *Karnoski, et al. v. Trump, et al.*, W.D. | ) | |
| Wash. Case No. 17-cv-01297-MJP | ) | |
| | ) | |
| *Stockman, et al. v. Trump, et al.*, C.D. Cal. | ) | |
| Case No. 17-cv-01799-JGB-KK | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF NONPARTY DR. AGNES GEREBEN
SCHAEFER'S MOTION TO QUASH SUBPOENAS**

# Table of Contents

**Page**

I.      INTRODUCTION ....................................................................................................... 1

II.     STATEMENT OF FACTS ......................................................................................... 3

    A.      Background ..................................................................................................... 3

    B.      The Litigation and Subpoenas ....................................................................... 7

III.    THE COURT SHOULD QUASH THE SUBPOENAS BECAUSE THE
        BURDEN FAR OUTWEIGHS ANY OSTENSIBLE NEED ......................................... 8

    A.      The Federal Rules Set a High Burden to Subpoena Nonparty Testimony. ........... 8

    B.      The Government Cannot Show the Requisite Need For Dr. Schaefer's
        Testimony ....................................................................................................... 9

        1.      Dr. Schaefer's testimony is not "critical" to understanding the
            Report or to testing its conclusions ........................................................... 9

        2.      The Government cannot meet its heightened burden under Rule 45
            to elicit unretained expert testimony from Dr. Schaefer ......................... 12

    C.      The Substantial Burden of Compliance on Dr. Schaefer Outweighs Any
        Ostensible Need For Her Testimony .............................................................. 14

    D.      Public Policy Favors Quashing the Subpoenas ............................................. 17

IV.     CONCLUSION ........................................................................................................ 18

## Table of Authorities

**Page(s)**

**Cases**

*Bio-Tech General Corp. v. Novo Nordisk*,
    No. 02-235-SLR, 2003 WL 21057238 (D. Del. 2003) ................................................... *passim*

*Buchanan v. Am. Motors Corp.*,
    697 F.2d 151 (6th Cir. 1983) ................................................................................14

*Cusumano v. Microsoft Corp.*,
    162 F.3d 708 (1st Cir. 1998) ................................................................................17

*In re Fosamax Products Liability Litig.*,
    No. 06-md-1789(JFK)(JCF), 2009 WL 2395899 (S.D.N.Y. Aug. 4, 2009) ...........................17

*Frank v. Honeywell Int'l Inc.*,
    No. 15-mc-00172, 2015 WL 4770965 (E.D. Pa. Aug. 13, 2015) .......................................9, 14

*Glaxosmithkline Consumer Health Care, L.P. v. Merix Pharmaceutical Corp.*,
    No. 05-mc-436, 2007 WL 1051759 (D. Utah April 2, 2007) ......................................13, 15, 16

*Mannington Mills, Inc. v. Armstrong World Indus., Inc.*,
    206 F.R.D. 525 (D. Del. 2002) ...............................................................................9, 14

*MedImmune, LLC v. PDL Biopharma, Inc.*,
    No. C08–05590 JF (HRL), 2010 WL 2794390 (N.D. Cal. July 15, 2010).......................12, 13

*Plough Inc. v. National Academy of Sciences*,
    530 A.2d 1152 (D.C. 1987) ...................................................................................17

*Rosa v. City of Seaside*,
    No. 05-03577 JF (HRL), 2009 WL 2382760 (N.D. Cal. July 29, 2009) ....................10, 11, 12

*Schering Corp. v. Amgen Inc.*,
    No. 98-98 MMS, 1998 WL 552944 (D. Del. 1998) ..............................................................13

*Thompson v. Glenmede Trust Co.*,
    No. 92-5233, 1995 WL 752422 (E.D. Pa. 1995) ...................................................................12

**Other Authorities**

Fed. R. Civ. P. 26 ...........................................................................................................8

Fed. R. Civ. P. 45 ................................................................................................... *passim*

48 C.F.R. § 35.017 .....................................................................................................3, 18

## I.       INTRODUCTION

Dr. Agnes Gereben Schaefer, a nonparty to the above-captioned actions (the "Litigation"), moves to quash four subpoenas issued by the Government on March 21, 2019.  The subpoenas seek to compel Dr. Schaefer, a senior political scientist at The RAND Corporation ("RAND"), to testify concerning a research report Dr. Schaefer wrote in 2016 about the implications of allowing transgender personnel to serve openly in the military (the "RAND Report" or "Report").  The Court should quash the subpoenas because the Government cannot show it needs Dr. Schaefer's deposition, and because the substantial burdens of compliance outweigh any ostensible need.

The Litigation concerns a Trump administration policy adopted in 2017 that limits the ability of transgender personnel to serve openly ("Trump Policy").  Plaintiffs claim, among other things, that the Trump Policy violates the equal protection and due process guarantees of the Fifth Amendment; the Government disagrees.  Dr. Schaefer had no involvement in making the Trump Policy; her only connection to the issues in the Litigation is the Report.  The Plaintiffs have sought to support their position in part by citing certain findings in the Report and the Government disputes vigorously those same findings.  Additionally, both the Government and one set of plaintiffs to the Litigation sought Dr. Schaefer's deposition.  Both RAND and Dr. Schaefer opposed being unwillingly dragged into this high profile dispute and declined.  The Plaintiffs withdrew their request but the Government did not, forcing this Motion.

The Government cannot show the requisite need to compel Dr. Schaefer to testify against her will.  Although the Government claims it needs to depose Dr. Schaefer to "test" the RAND Report's conclusions, assumptions and "factual underpinnings," the RAND Report itself – which is publicly available and peer reviewed – details Dr. Schaefer's research methodology.  The Report also identifies all assumptions, studies, research and data upon which those conclusions rely.  Thus, there is no percipient testimony Dr. Schaefer can provide about the Report that is not already in

the Report. To the extent the Government seeks to force Dr. Schaefer to offer expert opinions not already expressed, which appears to be its true motive, Rule 45(d)(3)(B)(ii) precludes it from doing so.

But even assuming that the Government could establish some need for a deposition, that need is outweighed by the burdens the subpoenas would impose. RAND and Dr. Schaefer have avoided taking sides in this Litigation. Compelling Dr. Schaefer to appear so that one side or the other can paint her as foe or ally threatens to tarnish her earned reputation for independence and objectivity, credentials upon which her career depends. Forcing her deposition also undermines the public interest in encouraging research on controversial issues of public policy. RAND social scientists like Dr. Schaefer benefit the public by investigating the nation's most pressing and important problems. If their research subjects them to being hauled into court every time a litigant disagrees with their findings, their work will be chilled. Finally, the subpoenas would impose significant professional burdens on Dr. Schaefer. The Government apparently intends to subject Dr. Schaefer to vigorous, public and hostile examination. The reputational stakes for Dr. Schaefer are high, and substantial preparation will be required. This will detract from and interfere with her other important work, much of it for the Department of Defense.

Should the Government (or Plaintiffs) wish to contest or support the findings of the RAND Report, they can and should engage their own retained experts to do so. There is no need for the deposition, and forcing Dr. Schaefer to testify would impose unjustifiable burdens upon her, RAND, and the public.

## II. STATEMENT OF FACTS

### A. Background

**The RAND Corporation.** Incorporated in 1948, RAND is a non-profit research institution founded to improve public policymaking through objective research and analysis. (*See*

Declaration of Jack Riley, ¶ 5, hereinafter "Riley Decl.").  It has locations across the nation and the world, including a major office in Pittsburgh near Carnegie Mellon University and the University of Pittsburgh.  (*Id*.)  Across a broad range of subjects, RAND's research on the major issues of the day is known for not only its empirical foundation, high quality and scientific rigor, but also its commitment to objectivity, independence and nonpartisanship.  (*Id*. ¶¶ 6-8; *see also RAND Standards for High-Quality Research and Analysis*, attached to Riley Decl. as Exhibit A.) In scientific research, objectivity is a central component to analytic success, and it often helps to improve the likelihood that such research will be used.  (Riley Decl., Ex. A, at 17.) For more than 70 years, decision makers in the public and private sectors have turned to RAND for impartial analyses that address the challenges facing the nation and the world.  (*Id*.) Often, it is RAND's reputation for objectivity, in combination with its high-quality scholarship and analysis, that results in its research becoming influential.  (Riley Decl. ¶ 7.) As such, RAND's credibility and continuing viability hinge, in substantial part, on maintaining its researchers' reputation for independence and objectivity.  (*Id*.)

RAND operates four federally funded research and development centers ("FFRDC"): Project Air Force, RAND Arroyo Center, the Homeland Security Operational Analysis Center, and the National Defense Research Institute ("NDRI").  FFRDCs are institutions chartered with the support of the federal government to perform research in areas and in ways that their sponsors cannot satisfy with internal resources or commercial contractors.  FFRDCs often work in politically sensitive areas because they are independent, apolitical, guided solely by the public interest, and funded to maintain a stable capability.  *See* 48 C.F.R. § 35.017(2).  RAND's NDRI is regularly called on by the Department of Defense ("DOD") to undertake analysis on sensitive policy issues when independence and objectivity are required.  (Riley Decl. ¶ 10.)

**Dr. Agnes Gereben Schaefer.**  As a senior political scientist based in RAND's Pittsburgh office, where she has worked for nearly 14 years, Dr. Schaefer has conducted research and scholarship on important and often controversial issues related to, among others, civil-military relations, disaster recovery operations, emergency preparedness, global security, military personnel, military strategy, and threat assessment.  (*See* Declaration of Dr. Agnes Gereben Schaefer, ¶ 3, hereinafter "Schaefer Decl.")  Since joining RAND in 2005, Dr. Schaefer has conducted more than 50 studies for senior civilian and military leaders, including those examining controversial topics which are the subject of litigation.  For instance, in addition to the RAND Report at issue here, Dr. Schaefer has also authored an analysis of the considerations for integrating women into combat roles in the U.S. Marine Corps infantry, which is currently being litigated in the Northern District of California by a large West Coast firm and the American Civil Liberties Union.  (*See id.* ¶ 12, Ex. B; Declaration of Patrick Gunn, Ex. K, hereinafter "Gunn Decl.")  As another example, Dr. Schaefer and others at RAND authored an analysis of the military's water management practices and water rights, which have been an issue in numerous litigations. (Schaefer Decl. ¶ 12, Ex. C.)  Other past reports she has authored concern equally controversial topics like the implications of allowing gays and lesbians to serve openly in the military and the security situation in Mexico.  (*Id.* ¶ 3.)

**The RAND Report.**  In September 2015, the Office of the Under Secretary of Defense for Personnel and Readiness commissioned RAND's NRDI to conduct a study to (1) identify the health care needs of the transgender population, transgender service members' potential health care utilization rates, and the costs associated with extending health care coverage for transition-related treatments; (2) assess the potential readiness implications of allowing transgender service

members to serve openly; and (3) review the experiences of foreign militaries that permit transgender service members to serve openly.  (*Id.* ¶ 6.)

In responding to these questions, RAND turned to Dr. Schaefer, who assembled a multidisciplinary research team of experts, including herself, to collect and analyze available data and research relating to the government's research questions.  On June 30, 2016, the results of the RAND study were published in a report authored by Dr. Schaefer and six other RAND researchers, Agnes Schaefer et al., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, RAND Corporation (RR-1530-OSD), 2016 (the "RAND Report"), attached to Schaefer Decl. as Exhibit A.  The RAND Report, like most RAND research products, is available free of charge to the public on RAND's Internet website. (www.rand.org/pubs/research_reports/RR1530.) The RAND Report is also peer reviewed, and extensively details not only the research methodology and manner in which the authors reached their findings, but also the studies, research and data on which those findings are based.  (*See* Schaefer Decl. ¶ 7, Ex. A.)  For instance, the RAND Report relies upon existing scientific studies into the experience of four countries that allow openly transgender persons to serve—Australia, Canada, Israel, and the United Kingdom—in concluding that "the available research revealed no significant effect on cohesion, operational effectiveness, or readiness."  (Schaefer Decl., Ex. A, RAND Report, at 44-45, 49-63.) The RAND Report cites each of the studies upon which it relies.  (*Id.*) The Report similarly discloses in depth the existing studies and data upon which it relies to estimate the transgender population in the U.S. military, and describes in detail how it used the information from these various studies and data sources to formulate its estimate.  (*Id.* at 11-17.)

**Use of the RAND Report.**  On June 30, 2016, former Secretary of Defense Ashton Carter decided to lift a longstanding policy that limited the ability of transgender individuals to serve

openly in the military.  (*See* Gunn Decl., Ex. F, at 14.)[1] Secretary Carter's decision rested in part on his review of the RAND Report.  (*Id.*) Neither RAND nor Dr. Schaefer participated in that policymaking decision, nor does the Government make any contrary allegations in the Litigation. (*See* Schaefer Decl. ¶ 8.)

On July 26, 2017, President Trump issued a statement via Twitter announcing that "the United States Government will not accept or allow transgender individuals to serve in any capacity in the U.S. Military."  (Gunn Decl., Ex. D.) One month later, on August 25, 2017, President Trump issued a Presidential memorandum formalizing the policy and directing former Secretary of Defense, James Mattis, to "submit ... a plan for implementing" this policy.  (Gunn Decl., Ex. E.) Pursuant to this directive, Secretary Mattis presented a memorandum to President Trump in February 2018 that proposed a new policy to limit transgender military service (the "Mattis Plan"). (*See* Gunn Decl., Ex. F, Mattis Memo and Panel Report.) In support of his Mattis Plan, the Secretary submitted a 44-page report (the "Panel Report") produced by a panel of military and medical experts (the "Panel") that the Secretary had commissioned to consider the implications of allowing transgender personnel to serve openly in the military, and to develop policy proposals. (*Id.*) The Mattis Plan and the Panel Report criticized certain findings in the RAND Report.  (*Id.*)

On March 23, 2018, President Trump issued a second memorandum on military service by transgender individuals, which stated that the President "revokes" his 2017 Presidential Memorandum, "and any other directive [he] may have made with respect to military service by transgender individuals."  (Gunn Decl., Ex. G.) The President ordered that "[t]he Secretary of

---

[1] Gunn Decl., Ex. F is a February 22, 2018 Memorandum from former Secretary of Defense James Mattis to President Trump, entitled *Military Service by Transgender Individuals*, which attaches a February 2018 Department of Defense report, titled *Report and Recommendations on Military Service by Transgender Persons*, hereinafter "Mattis Memo and Panel Report."

Defense, and the Secretary of Homeland Security, with respect to the U.S. Coast Guard, may exercise their authority to implement any appropriate policies concerning military service by transgender individuals."  (*Id.*) President Trump's March 23, 2018 memorandum allowed the Mattis Plan to come into effect.  Again, as with the policy adopted during the previous Administration with regard to military service for transgender individuals, neither RAND nor Dr. Schaefer participated in the formulation of the Trump Policy.  And, the Government makes no such allegations in the Litigation.  (*See* Schaefer Decl. ¶ 8.)

> **B.    The Litigation and Subpoenas**

After President Trump announced his new policy, Plaintiffs sued the government, challenging the policy on constitutional grounds and claiming, among other things, that the ban on open service violates the equal protection and due process guarantees of the Fifth Amendment. Discovery in the Litigation has commenced and the parties to it have focused some attention on the RAND Report.

In April 2018, counsel for the *Karnoski* Plaintiffs contacted RAND and asked to depose Dr. Schaefer.  (*See* Declaration of Dawn P. Ross, ¶ 2, hereinafter "Ross Decl.") On behalf of Dr. Schaefer, RAND's counsel declined Plaintiffs' request, questioning the need for the deposition and also expressing concerns that appearing would call into question Dr. Schaefer's and RAND's independence.  (*Id.* ¶ 3.)

In February 2019, the Government contacted RAND and asked to depose Dr. Schaefer. RAND's counsel declined, for the same reasons previously explained to Plaintiffs. (Ross Decl. ¶ 4.) On February 27, 2019, the Government served four deposition subpoenas on Dr. Schaefer, through RAND's counsel, in connection with four separate but similar actions: *Jane Doe 2, et al. v. Patrick M. Shanahan, et al.*, D.D.C. Case No. 17-cv-1597-CKK (filed Aug. 9, 2017); *Stone, et al. v. Trump, et al.*, D. Md. Case No. 17-cv-02459-GLR (filed Aug. 28, 2017); *Karnoski, et al. v.*

*Trump, et al.*, W.D. Wash. Case No. 17-cv-01297-MJP (filed August 28, 2017); *Stockman, et al. v. Trump, et al.*, C.D. Cal. Case No. 17-cv-01799-JGB-KK (filed Sept. 5, 2017).  (Ross Decl. ¶ 5, Ex. A, February 27, 2019 Subpoenas to Agnes Gereben Schaefer.)

On March 13, 2019, counsel for Dr. Schaefer informed the Government in writing that neither counsel nor Dr. Schaefer were available for deposition on March 21, and requested that the subpoenas be withdrawn for the reasons set out in this Motion.  (Gunn Decl. ¶ 2, Ex. A.) Counsel for the Government then informed Dr. Schaefer's counsel that the Government was willing to re-notice the subpoenas for a later date but would not withdraw them.  The Government claimed Dr. Schaefer's deposition was "critical" for them "to understand how the conclusions in the report were reached and the assumptions underlying them."  (Gunn Decl. ¶ 3, Ex. B.) The Government further stated its "goal for the deposition is just to gather information and to test the factual underpinnings of and the conclusions in the report."  (*Id.*) This Motion followed.

## III.   THE COURT SHOULD QUASH THE SUBPOENAS BECAUSE THE BURDEN FAR OUTWEIGHS ANY OSTENSIBLE NEED

### A.   The Federal Rules Set a High Burden to Subpoena Nonparty Testimony.

Federal Rules of Civil Procedure 26 and 45 govern nonparty subpoenas.  Rule 26(b) limits discovery to matters that are "proportional to the needs of the case, considering … whether the burden or expense of the proposed discovery outweighs its likely benefit."  In addition, Rule 26(c)(1) confers upon the Court broad discretion to issue an order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."[2]  Rule 45(d)(3)(B)(ii) also permits the Court to quash or modify a subpoena which requires "disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results

---

[2] Rule 45(d)(3)(A) similarly provides that a Court "must quash or modify a subpoena that … subjects a person to undue burden."

from the expert's study that was not requested by a party." The subpoenaing party carries the burden of showing a viable need for the nonparty discovery it seeks. *Frank v. Honeywell Int'l Inc.*, No. 15-mc-00172, 2015 WL 4770965, at *4-5 (E.D. Pa. Aug. 13, 2015).

In applying these rules, the Court ultimately must balance the competing interests to determine if the subpoenaing party's asserted need for the discovery outweighs the harm to the nonparty and society that may result. *See Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525, 529 (D. Del. 2002) ("[D]iscovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit."). The Court "should be particularly sensitive to weighing the probative value of the information sought against the burden of production on a non-party." *Frank,* 2015 WL 4770965, at *4. Indeed, where subpoenas seek unretained expert testimony, courts presume burden on the nonparty, who can withhold his or her expertise unless and until the subpoenaing party "shows a *substantial* need for the testimony or material that cannot be otherwise met without undue hardship." Fed. R. Civ. P. 45(d)(3)(C)(i), Advisory Committee Notes (emphasis added); *accord. Bio-Tech General Corp. v. Novo Nordisk*, No. 02-235-SLR, 2003 WL 21057238, at *3 (D. Del. 2003).

**B.    The Government Cannot Show the Requisite Need For Dr. Schaefer's Testimony.**

**1.    Dr. Schaefer's testimony is not "critical" to understanding the Report or to testing its conclusions.**

It is axiomatic that "discovery is not allowed where no need is shown." *Mannington Mills, Inc.*, 206 F.R.D. at 529; *Frank*, 2015 WL 4770965, at *4-5 (quashing deposition of unretained expert where subpoenaing party failed to show the deposition was necessary). Here, the Government seeks to examine Dr. Schaefer on the research she helped conduct (along with others at RAND) on the implications of allowing transgender personnel to serve openly in the military,

and has offered two reasons that Dr. Schaefer's testimony is necessary.  Both reasons are meritless and do not justify enforcement of the subpoenas.

First, the Government claims Dr. Schaefer's testimony is "critical" for it "to understand how the conclusions in the report were reached and the assumptions underlying them."  (*See* Gunn Decl. ¶ 3, Ex. B.)   However, the RAND Report itself extensively outlines the research methodology and manner in which the authors reached their conclusions, and explicitly states the assumptions, studies, research and data upon which those conclusions rely.  For instance, on the potential readiness implications of allowing transgender service members to serve openly, the RAND Report explains that it relies upon existing scientific studies into the experience of four countries that allow openly transgender persons to serve—Australia, Canada, Israel, and the United Kingdom—in concluding that "the available research revealed no significant effect on cohesion, operational effectiveness, or readiness."  (*See* Schaefer Decl., Ex. A, RAND Report, at 44-45, 49-63.)  The RAND Report cites the specific studies on which it relies.  (*See id.*)  It is therefore not necessary to depose Dr. Schaefer to understand "how the conclusions in the report were reached" or "the assumptions underlying them," as the Government claims, because the Report speaks for itself on the issue.  *See Rosa v. City of Seaside*, No. 05-03577 JF (HRL), 2009 WL 2382760, *3 (N.D. Cal. July 29, 2009) (party failed to demonstrate need for nonparty testimony on study where study detailed its methodologies).  There is nothing that Dr. Schaefer can add to a deposition on this or any other relevant issue that is not already in the RAND Report.

Second, the Government claims Dr. Schaefer's testimony is necessary "to gather information … to test the factual underpinnings of and the conclusions in the report."  But Dr. Schaefer's testimony is not necessary for this purpose either.  Again, the RAND Report's factual underpinnings and conclusions are explicitly stated and extensively supported with citations to the

supporting methodology and evidence in the Report itself.  The Government has access to all the studies, research and data upon which the Report's conclusions rely.  Should the Government seek to challenge or affirm the findings of the RAND Report, it has the resources and capability to employ an expert witness who can analyze the Report's publicly available data and methodologies to test its conclusions.  *See Rosa*, 2009 WL 2382760 at *3 (quashing subpoena to nonparty researcher where party could employ its own experts to challenge study that "itself outline[d] in detail the research methodology and manner in which the authors reached their conclusions").  In fact, the Government has already done so.  Former Secretary of Defense James Mattis and the panel of experts he created to review the prior administration's policy towards transgender service members were able to evaluate the RAND Report and its underlying methodologies and findings without the involvement of Dr. Schaefer or RAND.  (*See* Gunn Decl., Ex. F, Mattis Memo and Panel Report.) Take, for instance, the example discussed above, where the RAND Report cites to the specific studies it relied upon in concluding that "the available research revealed no significant effect on cohesion, operational effectiveness, or readiness."  The Government's Panel Report had no difficulty challenging RAND's analysis and conclusions on unit readiness, specifically stating that "the RAND study mischaracterizes or overstates the reports upon which it rests its [unit readiness] conclusions," and then discussing one-by-one why the Panel believed each study RAND relied upon did not adequately support RAND's unit readiness conclusions.  (*Id.* at 38-40.) The Government and its experts have thus already tested the "factual underpinnings" of the Report and do not need to force Dr. Schaefer to testify.

Finally, the fact that Plaintiffs rely on the RAND Report to support their claims does not affect the analysis of whether the Government has shown sufficient "need" for the testimony.  "The reliance of the opposing party on a study does not entitle the moving party to a fishing expedition

in order to attack a report that it dislikes." *Rosa*, 2009 WL 2382760, *3.

> **2.    The Government cannot meet its heightened burden under Rule 45 to elicit unretained expert testimony from Dr. Schaefer.**

Because the Report speaks for itself as to its basis and methodology, the Government's true reason for seeking Dr. Schaefer's deposition must be to cross examine her and elicit comment on matters related to the Report, but not expressed in it.  This would include, among other things, why Dr. Schaefer used one approach and not another, the viability of alternate interpretations of the evidence, or her opinions about the Government's many criticisms of the Report.  This is expert testimony.  *See MedImmune, LLC v. PDL Biopharma, Inc.*, No. C08–05590 JF (HRL), 2010 WL 2794390, at *2 (N.D. Cal. July 15, 2010) (rejecting argument that subpoena seeking testimony "about the circumstances surrounding" the preparation of an expert declaration sought factual rather than expert testimony); *Thompson v. Glenmede Trust Co.*, No. 92-5233, 1995 WL 752422, at *4 (E.D. Pa. 1995) (subpoena for industry analyst's testimony "to explain the significance of the information" in certain reports he prepared and "the reasons for his conclusions" sought expert testimony).

Rule 45 protects witnesses from subpoenas that seek "disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study made that was not requested by a party." Fed. R. Civ. P. 45(d)(3)(B)(ii).  Under Rules 45(d)(3)(B)(ii) and 45(d)(3)(C)(i), subpoenas seeking unretained expert testimony require a heightened showing of need, and must be quashed unless the subpoenaing party can demonstrate "a substantial need for the testimony or material that cannot be otherwise met without undue hardship." *Bio-Tech General Corp*, 2003 WL 21057238, at *3 (quoting *Schering Corp. v. Amgen Inc.*, No. 98-98 MMS, 1998 WL 552944, at *2 (D. Del. 1998)) (internal quotations omitted).  In determining whether there is a "substantial need" for compelling the testimony of an unretained

expert, courts have considered: (1) "the degree to which the expert is being called because of [her] knowledge of facts relevant to the case rather than in order to give opinion testimony," (2) "the possibility that, for other reasons, the witness is a unique expert," and (3) "the extent to which the calling party is able to show the unlikelihood that any comparable witness will willingly testify." *Id.*

The Government cannot make this showing.  As discussed above, Dr. Schaefer has no relevant factual information to offer the Government in a deposition.  She has no firsthand knowledge of the Trump Administration's adoption of the policies or directives at issue, or the use (or rejection) of the RAND Report in such adoption.  Dr. Schaefer's only connection to the Litigation is that she authored the RAND Report, yet this connection is insufficient to establish a need for her deposition.  Indeed, courts have routinely quashed subpoenas in similar circumstances, where an unretained expert's study is germane to the parties' dispute but the expert otherwise lacks relevant factual information.  *See, e.g.*, *Glaxosmithkline Consumer Health Care, L.P. v. Merix Pharmaceutical Corp.,* No. 05-mc-436, 2007 WL 1051759, at *3 (D. Utah April 2, 2007) (in false advertisement case, quashing deposition of nonparty researcher who published studies finding "Abreva is no more efficacious in treating cold sores than a placebo" in part because researcher was "not as an observer of facts giving rise to liability"); *see also MedImmune, LLC v. PDL Biopharma, Inc.*, 2010 WL 2794390, at *2 (similar).

Likewise, Dr. Schaefer is not a "unique witness," and the Government cannot show an "unlikelihood that any comparable witness will willingly testify."  *Bio-Tech General Corp.*, 2003 WL 21057238, at *3.  The Government has all the information it needs to challenge the conclusions of the RAND Report, and the resources and capability to employ an expert to do so (and, notably, has already done so).  (*See* Gunn Decl., Ex. F, Mattis Memo and Panel Report.)  Accordingly, the

Government has not met its burden of showing substantial need for the testimony and the subpoenas should be quashed on this ground alone.  *See Bio-Tech General Corp.*, 2003 WL 21057238, at *3.

### C. The Substantial Burden of Compliance on Dr. Schaefer Outweighs Any Ostensible Need For Her Testimony.

Discovery should be denied "where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit."  *Mannington Mills, Inc.*, 206 F.R.D. at 529; *Frank*, 2015 WL 4770965, at *4-5.  In weighing burden versus need, courts are particularly sensitive to burdens placed on nonparty researchers like Dr. Schaefer.  *See, e.g.*, *Buchanan v. Am. Motors Corp.*, 697 F.2d 151, 152 (6th Cir. 1983) (quashing subpoena to nonparty researcher that would require him to "spend a large amount of time itemizing and explaining the raw data that led him to a research opinion adverse to the interest of a party which is the author of the subpoena").

Even assuming for the sake of argument that the Government could establish some need for Dr. Schaefer's deposition, that need is significantly outweighed by the burdens the subpoenas would impose.  Compelling Dr. Schaefer's testimony in this matter risks irreparable damage to Dr. Schaefer's earned reputation for independence and objectivity, credentials on which her career depends.  Dr. Schaefer's research is trusted in substantial part because of its objectivity.  As such, her credibility and viability hinge, in great part, on maintaining her reputation for independence. (Schaefer Decl. ¶ 9.)  The same is true for RAND, her employer.  (Riley Decl. ¶¶ 7-11.)  For these reasons, Dr. Schaefer and RAND have scrupulously avoided taking sides in this divisive Litigation.  But the foreseeable consequence of enforcing the subpoenas in this case is that Dr. Schaefer and RAND will be associated with one side.  Plaintiffs, who appear not to question any portion of the RAND Report, will presumably seek to cast Dr. Schaefer as an ally, while the Government, which objects to certain findings in the RAND Report, will presumably seek to

discredit Dr. Schaefer and RAND as partisan.  The risk of lasting reputational damage to Dr. Schaefer and RAND easily outweighs any need the Government can show.  *See Glaxosmithkline*, 2007 WL 1051759, at *3 (subpoena imposed undue burden where it would put nonparty researcher "in the unenviable position of being caught between two conflicting pharmaceutical giants," which risked compromising "the integrity of [his] intellectual property").

The subpoenas would also impose significant professional burdens on Dr. Schaefer.  The Government's position, in defending the Mattis Plan and as reflected its prior filings in this Litigation, makes clear that it strongly objects to key findings in the RAND Report.  (*See, e.g.*, Gunn Decl., Ex. F, Mattis Memo and Panel Report, Exs. H-K.) It is therefore reasonable to expect that the Government's evaluation of Dr. Schaefer will be vigorous and extensive and call Dr. Schaefer's professional reputation into question in a very public manner.  Compliance with the subpoenas will likewise require Dr. Schaefer to set aside her important other research (much of it for the DOD and its components) to prepare for such an examination.  Among other things, she will need to invest considerable time revisiting research she conducted years ago, and preparing for questions on the Mattis Plan and the Panel Report's criticisms of the RAND Report.   (*See* Schaefer Decl. ¶ 11.)

Courts have not hesitated to quash subpoenas as unduly burdensome in similar circumstances.   For example, in *Glaxosmithkline Consumer Health Care, L.P. v. Merix Pharmaceutical Corp.*, in connection with a false advertising lawsuit between two large pharmaceutical companies, the court quashed a subpoena for the deposition of a nonparty researcher as unduly burdensome where it would require him to "expend significant time and effort re-reviewing his findings and conclusions" from prior studies he conducted into the efficacy of plaintiff's cold sore remedy.  2007 WL 1051759 at *3.  The *Glaxosmithkline* court rejected the

argument that the proposed deposition presented no burden because no documents were sought, finding the "preparation" for the deposition "would be very significant." *Id.* The same result is warranted here in light of the significant preparation Dr. Schaefer will need to undertake if the subpoenas are enforced.

As significantly, in analyzing burden, courts have examined the degree to which an unretained expert may be "oppressed by having to continually testify." *Bio-Tech General Corp.*, 2003 WL 21057238, at *3. This concern applies here. Were Dr. Schaefer compelled to testify for the Government here, it is reasonably foreseeable that other litigants who are disputing (or agreeing with) the RAND Report will also seek her deposition. And this concern goes well beyond the issue of this single Report she co-authored. Dr. Schaefer has conducted more than 50 studies for senior United States civilian and military leaders, many of which concern controversial policy issues that have been the subject of litigation. (Schaefer Decl. ¶ 12.) For instance, Dr. Schaefer is the lead author of a RAND study, titled *Implications of Integrating Women into the Marine Corps. Infantry*, which included discussion of women serving in combat roles. (*See* Schaefer Decl. ¶ 12, Ex. B.) This report has been cited and discussed in at least one case currently pending in the U.S. District Court for the Northern District of California. (*See* Gunn Decl., Ex. L.) Another study Dr. Schaefer authored, titled *An Assessment of Options for Increasing Gender Integration in Air Force Basic Military Training* was also cited and discussed in that case. (*See* Schaefer Decl. ¶ 12.) Additionally, Dr. Schaefer was an author of a RAND study, titled *Water Management, Partnerships, Rights, and Market Trends*, which examined the military's water management practices and water rights. As that report details, the military's water management practices have been the subject of numerous federal lawsuits. (*See* Schaefer Decl. ¶ 12, Ex. C.) Accordingly, if

this Court were to enforce the subpoenas at issue on this Motion, the potential impact on Dr. Schaefer and the distraction from her work is both real and enormous.  (Schaefer Decl. ¶¶ 11-13.)

### D.      Public Policy Favors Quashing the Subpoenas.

The Court should also consider the greater public policy concerns at stake on this motion. "Federal courts interpreting the discovery rules have frequently denied or limited discovery absent claims of formal privilege, based upon reasons of public policy." *Plough Inc. v. National Academy of Sciences*, 530 A.2d 1152, 1157 (D.C. 1987).

Subjecting Dr. Schaefer to the Government's vigorous and extensive examination in this case undermines the public interest in at least two significant ways.  First, it risks chilling research into important but highly controversial public issues.  Researchers like Dr. Schaefer would be less willing to perform important research on controversial topics if the consequence of doing so is being dragged into court by litigants and subjected to potential reputational harm.  (*See* Schaefer Decl. ¶ 13; Riley Decl. ¶ 16.) Courts in similar situations have not hesitated to quash subpoenas that threatened to chill beneficial public research.  *See In re Fosamax Products Liability Litig.*, No. 06-md-1789(JFK)(JCF), 2009 WL 2395899, at *3-5 (S.D.N.Y. Aug. 4, 2009) (quashing deposition subpoena to nonparty researcher at National Academy of Sciences because the "potential chilling effect" to beneficial public research outweighed any need for the deposition; "Compelling testimony from a third party researcher risks chilling participation in beneficial public research"); *Plough Inc.*, 530 A.2d at 1157 (similar); *see also Cusumano v. Microsoft Corp.*, 162 F.3d 708, 712, 716-17 (1st Cir. 1998) (applying balancing test of need versus burden in affirming trial court's decision to deny the production of academic research materials, particularly where they were sought from a third party "for purposes akin to impeachment").

Second, enforcement of the Government's subpoenas would undermine the public interest because, as described above, it risks compromising Dr. Schaefer's and RAND's reputation for

-17-

objectivity and independence, which requires that they not be associated with one side or the other in these actions, or any other action.  As the Government knows, the RAND Report was conducted within the Forces and Resources Policy Center of RAND's National Defense Research Institute. NDRI, like other FFRDCs, is an institution chartered to perform research in areas and in ways that their government sponsors cannot satisfy with internal resources or through commercial contractors.  (Riley Decl. ¶¶ 9-10.)  FFRDCs can work in politically sensitive areas precisely because they are independent, apolitical, guided solely by the public interest, and funded to maintain a stable capability.  *See* 48 C.F.R. § 35.017(2).  The continued ability of NDRI (and its associated researchers such as Dr. Schaefer) to discharge this important public mission is undermined if they are perceived to align with one side in litigation.  Compelling researchers like Dr. Schaefer, and FFRDCs like RAND's NDRI, into proceedings as divisive as the Litigation unjustifiably undermines the public trust in their work, and the value of their work to the public. (*See* Riley Decl. ¶ 12.)

## IV.    CONCLUSION

For the reasons stated above, Dr. Schaefer respectfully requests that the Court quash the subpoenas.

Dated: Pittsburgh, Pennsylvania
March 28, 2019

By:  *s/Maria Greco Danaher*
Maria Greco Danaher

Maria Greco Danaher
P.A. I.D. No. 47036
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One PPG Place, Suite 1900
Pittsburgh, Pennsylvania 15222
(412) 394-3390
maria.danaher@ogletree.com

-and-

Patrick Gunn (*Pro Hac Vice pending*)
Kyle C. Wong (*Pro Hac Vice pending*)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, California 94111
(415) 693-2000
pgunn@cooley.com
kwong@cooley.com

Nathaniel Putnam (*Pro Hac Vice pending*)
COOLEY LLP
55 Hudson Yards, 46th Floor
New York, NY 10001
(212) 479-6000
nputnam@cooley.com

-and-

Dawn P. Ross
THE RAND CORPORATION
Office of the General Counsel
1776 Main Street, P.O. Box 2138
Santa Monica, California 90407-2138
(310) 393-0411
dross@rand.org

*Counsel for Nonparty Movant Dr. Schaefer*