**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

)
)
)
In Re Subpoenas To            )
Dr. Agnes Gereben Schaefer    )    2:19-mc-00448
)
)
)
)
)

## OPINION

**Mark R. Hornak, Chief United States District Judge**

The Government issued four subpoenas to Dr. Agnes Gereben Schaefer ("Dr. Schaefer"),
a senior political scientist employed by the RAND Corporation ("RAND") in Pittsburgh,
Pennsylvania, on February 27, 2019. (Declaration of Dawn P. Ross ("Ross Dec.") ¶ 5, ECF No.
5). The Government seeks Dr. Schaefer's deposition testimony in relation to four cases currently
pending in other district courts. *Stockman v. Trump*, No. 17-cv-1799 (C.D. Cal. filed Sept. 5,
2017); *Stone v. Trump*, No. 17-cv-2459 (D. Md. filed Aug. 28, 2017); *Karnoski v. Trump*, No.
17-cv-1297 (W.D. Wash. filed Aug. 28, 2017); *Doe 2 v. Shanahan*, No. 17-cv-1597 (D.D.C.
filed Aug. 9, 2017). The plaintiffs in those four cases are challenging portions of an
Administration policy that impacts the ability of transgender persons to serve in the United States
Armed Forces.

Now before the Court is Dr. Schaefer's Motion to Quash Subpoenas. (ECF No. 1). The
matter has been fully briefed and the Court held Oral Argument on April 30, 2019. (ECF No.
31). For the reasons that follow, the Court will GRANT Dr. Schaefer's Motion to Quash.

## I. **BACKGROUND**

Each of the underlying litigations has developed a complicated procedural history, including some interlocutory trips to the Supreme Court of the United States. *See Trump v. Stockman*, No. 18-678, 139 S. Ct. 946 (U.S. Jan. 22, 2019); *Trump v. Karnoski*, No. 18-676, 139 S. Ct. 948, (U.S. Jan. 22, 2019). The courts in which these underlying litigations are pending have already issued opinions on requests for preliminary or provisional relief or for summary judgment which set forth the facts giving rise to these disputes. *See, e.g.*, *Karnoski v. Trump*, No. 17-cv-1297, 2018 WL 1784464 (W.D. Wash. Apr. 13, 2018), *appeal filed*, No. 18-35347 (9th Cir. Apr. 30, 2018).

Notwithstanding the nature of and arguments advanced in those underlying cases, the disposition of the issues before this Court turns on a straightforward application of a directly applicable civil rule and settled decisional law. Because the matter before this Court is of limited scope, the Court will set forth only those facts that are material for these purposes, which are largely undisputed by the parties.

The RAND Corporation ("RAND") "is a nonprofit, nonpartisan research organization incorporated in 1948 to improve public policy and decision making through research and analysis using its core values of quality and objectivity." (Declaration of Dr. K. Jack Riley ("Riley Dec.") ¶ 5, ECF No. 4). RAND's research addresses a vast variety of subjects concerning national security and domestic issues. (*Id.* ¶ 6). RAND refrains from any form of public advocacy in order to maintain its reputation for objectivity and independence, and RAND's research is subject to a rigorous peer review process from independent experts. (*Id.* ¶ 8). RAND operates four federally funded "research and development centers." Applicable federal regulations require that these centers operate "with objectivity and independence" and "free from

organizational conflicts of interest." (Riley Dec. ¶ 9) (citing 48 C.F.R. § 35.017(2)). Dr. Schaefer is a political scientist and researcher based in RAND's Pittsburgh, Pennsylvania office. (Declaration of Dr. Agnes Gereben Schaefer ("Schaefer Dec.") ¶ 6, ECF No. 3).

In September 2015, the Office of the Under Secretary of Defense for Personnel and Readiness commissioned RAND's National Defense Research Institute ("NDRI")—one of RAND's federally funded research and development centers—to conduct a study to evaluate the effects and feasibility of permitting open military service by transgender persons and to review the experiences of foreign militaries that permit transgender persons to so serve. (Schaefer Dec. ¶ 6). Dr. Schaefer was designated as the lead researcher and assembled a multidisciplinary team to conduct the study. (*Id.*). On June 30, 2016, the results of her and her team's study were published in a report (the "RAND Report") that is freely and publicly available online. (*Id.* ¶ 7).[1] Shortly thereafter, former Secretary of Defense Ashton Carter decided to lift certain restrictions that limited military service by transgender individuals. (Declaration of Patrick Gunn ("Gunn Dec.") ¶ 7, Exh. F, ECF No. 6). This decision (the "Carter Policy") rested in part on Carter's review of the RAND Report. (*Id.*).

On July 26, 2017, the President announced via Twitter (@realDonaldTrump) that the United States military would no longer "accept or allow transgender individuals to serve in any capacity." (Gunn Dec. ¶ 5, Exh. D). This tweet eventually evolved into a formal memorandum from then-Secretary of Defense James Mattis proposing a new policy (the "Mattis Policy") limiting military service by transgender individuals. (Gunn Dec. ¶ 7, Exh. F). On March 23, 2018, the President issued a declaration "revoking" any former memoranda that he had issued on the topic and allowed the Mattis Policy to come into effect. (Gunn Dec. ¶ 8, Exh. G). Dr.

---

[1] Agnes G. Schaefer et al., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, RAND Corp. (June 30, 2016), https://www.rand.org/pubs/research_reports/RR1530.html.

Schaefer did not directly participate in any of the executive policymaking decisions regarding either the Carter or Mattis Policy. (Schaefer Dec. ¶ 8).

Neither RAND nor Dr. Schaefer is a party in any of the four underlying litigations. She was not retained as an expert by any of the plaintiffs nor the Government in those cases. She and RAND oppose testifying on behalf of any party in the litigations or otherwise being inserted into the cases. (Ross Dec. ¶¶ 2–4; Transcript of April 30, 2019, Oral Argument ("Tr.") at 11:12–12:16, ECF No. 32). Dr. Schaefer voiced concerns that if she were deposed, it could fairly be viewed by some that she had "taken sides" in the underlying disputes. (Schaefer Dec. ¶ 10). According to Dr. Schaefer, any appearance of "taking sides" risks harm to her professional reputation, because the quality and value of her research depends on her reputation for objectivity and independence. (*Id.* ¶ 9). Dr. Riley explained that such concerns are also germane to RAND as an organization, as the value of RAND's research in complex issues is derived from RAND's objectivity, independence, scientific rigor, and nonpartisanship. (Riley Dec. ¶¶ 12–16). Dr. Schaefer is also concerned that enforcing these subpoenas would subject her to professional burdens by having to prepare for the deposition, and that were this deposition to occur, then in due course she would likely be subject to additional subpoenas relating to other research she has done (or will do) concerning other matters. (Schaefer Dec. ¶¶ 11–12). The Government acknowledges that the contract between RAND and the Government for the preparation of the RAND Report is silent as to whether any of contributors to the Report may be called or obligated to testify as a witness in litigation stemming from or related to the RAND Report. (Tr. at 86:2–7). Neither Dr. Schaefer nor RAND has testified on behalf of the Government or any of the plaintiffs in the underlying cases, and Dr. Schaefer and RAND represent that she and RAND will not voluntarily do so. (Ross Dec. ¶¶ 2–4; Tr. at 11:12–12:19).

## II.    LEGAL FRAMEWORK

Federal Rule of Civil Procedure 26(b)(1) provides the general scope of discovery in civil matters. Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Evidence is relevant if it has any tendency to make a consequential fact in an action more or less probable. Fed. R. Evid. 401. Consequently, the general scope of discovery is quite broad in civil actions. *See, e.g.*, *Pacitti v. Macy's*, 193 F.3d 766, 777 (3d Cir. 1999). Information need not be admissible in evidence to be discoverable, but courts are to consider "whether the burden or expense of the proposed discovery outweighs its likely benefit." *Ceuric v. Tier One, LLC*, 325 F.R.D. 558, 560 (W.D. Pa. 2018) (quoting Fed. R. Civ. P. 26(b)(1)).

Pursuant to Federal Rule of Civil Procedure 45, nonparties to a civil action may be subpoenaed to provide deposition testimony. The scope of discovery available from a subpoenaed nonparty is the same as the general scope of civil discovery under Rule 26. *See In re Rainwater*, No. 18-10051, 2018 WL 2088736, at *2 (D. Idaho May 4, 2018). Rule 45 also provides mechanisms by which a court may, or in certain circumstances must, quash a subpoena directed to a nonparty. Fed. R. Civ. P. 45(d)(3). A nonparty opposing a subpoena has the burden of establishing that Rule 45(d)(3) provides a basis to quash the subpoena if the discovery sought from the nonparty is relevant under Rule 26(b)(1). *Siroky v. Allegheny Cty.*, No. 15-1170, 2018 WL 1465759, at *2 (W.D. Pa. Mar. 26, 2018). A court must quash a subpoena that subjects a person to an undue burden or requires disclosure of privileged or other protected matter (if no exception or waiver applies). Fed. R. Civ. P. 45(d)(3)(iii)–(iv).

A court may, on motion, quash or modify a subpoena that seeks to compel the opinion testimony of an unretained expert that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.[2] Fed. R. Civ. P. 45(d)(3)(B)(ii). These latter protections were added as part of the 1991 Amendments to the Federal Rules of Civil Procedure in order to recognize and ensure the right of a nonparty expert to withhold his or her expertise unless the party seeking the testimony makes the necessary showings of necessity. *See Rosa v. City of Seaside*, No. 05-03577, 2009 WL 2382760, at \*1–\*2 (N.D. Cal. July 29, 2009) (discussing the significance of the 1991 Amendments and citing the Advisory Committee's Note to those amendments); *Schering Corp. v. Amgen Inc.*, No. 98-97, 1998 WL 552944, at \*3 n.4 (D. Del. 1998) (similar). However, a court may permit the deposition of an unretained expert to occur under specified conditions if the serving party can show a substantial need for the testimony that cannot be otherwise met without undue hardship and ensures that the subpoenaed person will be reasonably compensated. Fed. R. Civ. P. 45(d)(3)(C)(i)–(ii).

### III.    DISCUSSION

a. Relevance

As a baseline matter, the Court concludes that generally speaking, Dr. Schaefer's testimony relative to her work could be, for these purposes, considered relevant to the underlying lawsuits so as to satisfy Rule 26. The policymaking decisions of the current and prior Administrations are at issue in the underlying litigations, and Dr. Schaefer acknowledges that the RAND Report informed some of these policymaking decisions. (Schaefer Dec. ¶ 8). Thus,

---

[2] The "requested by a party" language in Rule 45(d)(3)(B)(ii) means that the study was requested by a party for the purposes of the pending litigation. *See, e.g., Mylan Inc. v. Analysis Grp., Inc.*, No. 18-209, 2018 WL 5043157, at \*3–\*4 (D. Kan. Oct. 17, 2018). There is no dispute that the Government initially retained RAND and Dr. Schaefer to prepare the RAND Report, but it was certainly not for the purposes of the current litigations here. The Court agrees with the reasoning and conclusion of the *Mylan* court on this point and concludes that the "requested by a party" provision in Rule 45(d)(3)(B)(ii) is inapplicable here.

information about the Report therefore could possibly bear on the issue of the reliability of reliance on the Report and its conclusions, which might tend to make it more or less probable that the respective policy decisions were or were not reasonable. The threshold for relevancy under Rule 26 is minimal, *see, e.g.*, *Walker v. Life Ins. Co. of the S.W.*, No. 10-09198, 2018 WL 5905121, at *3 (C.D. Cal. Oct. 23, 2018), and Dr. Schaefer does not vigorously dispute that the Government can meet that low bar here. Of course, the "heft" of any relevance matters in resolving these issues, since "[e]ven relevant discovery is not permitted where no need is shown or compliance would be unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking the information." *In re Nat'l Hockey League Players' Concussion Injury Litig.*, No. 14-2551, 2017 WL 1493671, at *7 (D. Minn. Apr. 26, 2017) (quoting *Misc. Docket Matter No. 1 v. Misc. Docket Matter No. 2*, 197 F.3d 922, 927 (8th Cir. 1999)).

    b.  Mandatory Quashing

        Dr. Schaefer does not claim that the subpoenas would not allow her a reasonable time to comply, would require her to comply outside of the relevant geographical limits, or would require the disclosure of privileged or other protected matter. *See* Fed. R. Civ. P. 45(d)(3)(A)(i)–(iii). Therefore, the Court is not *required* to quash these subpoenas unless Dr. Schaefer can demonstrate that compliance with the subpoenas would subject her to an undue burden. Fed. R. Civ. P. 45(d)(3)(A)(iv). "A court balancing undue hardship against need for the requested information may consider multiple factors, including the (1) relevance of the requested materials, (2) the party's need for the documents, (3) the breadth of the request, (4) the time period covered by the request, (5) the particularity with which the documents are described, (6) the burden imposed, and (7) the recipient's status as a non-party." *Pennsylvania v. Think Fin., LLC*, No. 14-

7139, 2018 WL 4635750, at *2 (E.D. Pa. Sept. 26, 2018) (internal quotations omitted). Dr. Schaefer's arguments regarding an undue burden dovetail in certain respects with her arguments that the Government has no substantial need for her testimony, and thus the Court finds it appropriate to address those issues at the same time.

    c. <u>Characterization of the Testimony Sought</u>

Expert testimony is opinion testimony that is based on a qualified expert's relevant knowledge, skill, experience, training, or education applied to relevant facts or data. Fed. R. Evid. 702. While the line between expert testimony and factual testimony may at times be thin, *see MedImmune, LLC v. PDL Biopharma, Inc.*, No. C08-05590, 2010 WL 2794390, at *2 (N.D. Cal. July 15, 2010), as set forth below, that is not the case here. The relevant inquiry is whether the testimony sought concerns information that was obtained directly through the observations of the witness rather than information that the witness came to learn from his or her own study. *Compare, e.g., In re Public Offering PLE Antitrust Litig.*, 233 F.R.D. 70, 77–78 (D. Mass. 2006) (holding that testimony regarding pricing practices in an industry that the nonparty expert allegedly observed as an industry participant would be factual testimony because it described events in dispute in the underlying antitrust litigation), *with Mylan Inc. v. Analysis Grp., Inc.*, No. 18-209, 2018 WL 5043157, at *7 (D. Kan. Oct. 17, 2018) (holding that the types of materials requested—"internal deliberations, communications, predictions, assessments, recommendations, research and analysis, projections, estimates, draft advice, and analyses"— resulted from the nonparty's studies and therefore were subject to the protections in Rule 45(d)(3)(B)(ii) for unretained experts).

In order to assist the Court in framing the issues for Oral Argument, the Court instructed the Government to file a Notice listing the topics for Dr. Schaefer's deposition. (ECF No. 29).

All but Item 10 of that listing seek information relating to Dr. Schaefer's preparation and drafting of the RAND Report or other writings that she authored, and thus plainly seek the compelled testimony of an unretained expert. *See, e.g.*, *Thompson v. Glenmede Trust Co.*, No. 92-5233, 1995 WL 752422, at *4 (E.D. Pa. 1995) (holding that deposition testimony sought "to explain the significance of the information in the reports and the reasons for [the witness's] conclusions" was expert testimony subject to the protections in Rule 45 for nonparties); *accord Mylan*, 2018 WL 5043157 at *7 (reaching same conclusion regarding "internal deliberations, communications, predictions, assessments, recommendations, research and analysis, projections, estimates, draft advice, and analyses").

The Court's conclusion that the vast majority of the testimony that the Government seeks from Dr. Schaefer is plainly expert rather than factual testimony is not necessarily fatal to the Government's position. Dr. Schaefer may be subpoenaed to appear if the Government can demonstrate that it has a substantial need for her testimony that cannot otherwise be met without undue hardship. Fed. R. Civ. P. 45(d)(3)(C)(i).[3] This is the same "heavy burden" that a party seeking disclosure of work product evidence must meet. *See Glenmede Tr. Co.*, 1995 WL 752422 at *4. "To establish undue hardship, [a] party must show that the substantial equivalent cannot be obtained through other means." *Friedland v. TIC – The Industrial Co.*, No. 04-cv-01263, 2006 WL 2583113, at *3 (D. Colo. Sept. 5, 2006) (internal quotation and quotation marks omitted). The Advisory Committee Notes to Rule 45 also outline a number of factors for courts to consider in determining whether such discovery should be allowed, as originally stated in *Kaufman v. Edelstein*, 539 F.2d 811, 822 (2d Cir. 1976).

> [1] the degree to which the expert is being called because of his
> knowledge of facts relevant to the case rather than in order to give

---

[3] The Government has represented that it is willing to compensate Dr. Schaefer for her testimony so as to satisfy Rule 45(d)(3)(C)(ii), (ECF No. 21 at 24), and Dr. Schaefer does not dispute this.

> opinion testimony; [2] the difference between testifying to a previously formed or expressed opinion and forming a new one; [3] the possibility that, for other reasons, the witness is a unique expert; [4] the extent to which the calling party is able to show the unlikelihood that any comparable witness will willingly testify; [5] and the degree to which the witness is able to show that he has been oppressed by having continually to testify.

*Kaufman*, 539 F.2d at 822. This test was provided in the Advisory Committee Notes to the 1991 Amendments, and courts still rely on this analysis in determining whether to quash a subpoena directed to a nonparty. *See, e.g.*, *Mylan*, 2018 WL 5043157 at *7; *MedImmune, LLC v. PDL Biopharma, Inc.*, No, C08-05590, 2010 WL 2794390, at *2 (N.D. Cal. July 15, 2010); *Bio-Technology Gen. Corp. v. Novo Nordisk*, No. 02-235, 2003 WL 21057238, at *3 (D. Del. May 7, 2003). Applying the factors set forth in *Kaufman*, and considering the arguments from both parties, the Court concludes that the Government has failed to demonstrate that it has a substantial need for Dr. Schaefer's testimony that cannot otherwise be met without undue hardship.

i.     Dr. Schaefer is being called upon to provide opinion testimony rather than for her knowledge of facts relevant to the case.

First, it is abundantly clear that Dr. Schaefer is primarily being sought in order to give opinion testimony rather than to provide testimony about her knowledge of facts relevant to the cases. All of the topics identified in the Government's Notice at ECF No. 29 (save Item 10) in one way or another seek information about Dr. Schaefer's internal mental processes throughout the development of the RAND Report.[4] That is, the Government seeks testimony as to *how* Dr.

---

[4] The Court reaches the same conclusion regarding Item 11 in the Government's Notice, which seeks testimony about "the circumstances leading to, the reasoning, or the basis for, the statements" in a blog post authored by Dr. Schaefer regarding the RAND Report. (ECF No. 29 ¶ 11). The blog post in question is on RAND's own blog, which is publicly available online. Agnes G. Schaefer, *On RAND's Research Findings Regarding Transgender Military Personnel Policy*, The RAND Blog (Mar. 27, 2018), https://www.rand.org/blog/2018/03/on-rands-research-findings-regarding-transgender-military.html. In the Court's estimation, Item 11 is essentially a repackaging of the requests in Items 1–9. The Government alleges that this blog post evinces ambiguity in the RAND Report, so it appears to the Court that the Government's desire to probe the "circumstances leading to" the blog post stems

Schaefer employed her specialized knowledge, skill, experience, training, or education to arrive at, what was in her opinion, an accurate analysis of the data in the study. *See* Fed. R. Evid. 702. Dr. Schaefer's only relation to the underlying cases is as the author of the RAND Report—which memorialized the findings and conclusions of that study along with the pertinent data and methodologies she and her team utilized. This Report was purportedly extensively relied upon by the prior and current Administrations in formulating their policies on military service by transgender persons. But the Government does not contend—let alone demonstrate—that Dr. Schaefer *herself* participated in making any of those policy decisions. Those decisions are the "facts" which are central to the underlying cases, and there is no showing that Dr. Schaefer has personal knowledge of those facts, and therefore could testify about them. Fed. R. Evid. 602.[5]

For this reason, the Government's argument that Rule 45(d)(3)(B)(ii)'s exception for expert opinion or information "that . . . describe[s] specific occurrences in dispute" is unavailing. *Glaxosmithkline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corporation*, No. 05-436, 2007 WL 1051759 (D. Utah Apr. 2, 2007), is instructive. The defendants in *Glaxosmithkline* sought to depose a professor who authored numerous studies regarding the efficacy of the drug at issue in that case. *Id.* at *1. Like the Government here, there was no dispute that the defendants in *Glaxosmithkline* had access to all of the professor's studies. Also like the Government here, the defendants in *Glaxosmithkline* argued that the professor's testimony regarding the factual basis for the conclusions in his reports would relate to "events or occurrences in dispute." *Id.* at

---

entirely from its desire to explore the creation of the RAND Report and/or impeach its reasoning and conclusions. Moreover, testimony regarding the creation of the blog post would relate to Dr. Schaefer's mental processes, analyses, and other opinions rather than from facts that she personally observed, which would place Item 11 within the protections of Rule 45.

[5] As described by counsel for Dr. Schaefer at Oral Argument, the RAND Report was a "meta" study relying on previous studies and data. (Tr. at 17:12–18:12). She did not do any "field work" in preparing her report and relied upon available research that had already been conducted. (*Id.*) This is to further underscore that Dr. Schaefer *herself* did not personally observe occurrences in dispute here, nor could her testimony provide any further factual information that the Government does not already have access to through the RAND Report itself.

*2. The *Glaxosmithkline* court did not agree, explaining that the professor's relevant knowledge in that case was confined to information resulting from his study as an expert. *Id.* at *3. The "events or occurrences in dispute" refer to those facts that are "the *substance* of the wrongful act alleged in the lawsuit, not the result of studies related to a fact at issue in the suit." *Id.* (emphasis in original); *see also Mylan*, 2018 WL 5043157, at *6–*7 (rejecting argument that information regarding the research and preparation of a report described the "specific occurrences in dispute").

The Government cites *Radware, Ltd. v. A10 Networks, Inc.*, No. 13-02021, 2014 WL 631537 (N.D. Cal. Feb. 18, 2014), as an example of a court characterizing statements made in a declaration to a government agency as "factual," but *Radware* is distinguishable. The *Radware* court held that statements made in a declaration to the United States Patent and Trademark Office to distinguish prior art during the prosecution of a patent were "factual" and testimony related to them did not fall within the scope of Rule 45(d)(3)(B)(ii) as expert testimony. *Id.* at *3. Those statements were relevant to the patent-in-suit's "validity, enforceability, and claim construction," *id.* at *2, which are material considerations in almost any patent infringement case. Thus, those statements, which were conveyed to the Patent Office in order to secure issuance of the patent, were "facts relevant to the case." *See Kaufman*, 539 F.2d at 822. As discussed, the "facts relevant to the[se] case[s]" are the policy decisions made by the current and former Administrations, decisions from which Dr. Schaefer was at least one step removed. Deposing Dr. Schaefer here would be akin to deposing a nonparty who authored a scientific study that the declarant in *Radware* cited in support of one or more statements in his declaration to the Patent Office. The conclusions in *Radware* are not broad enough to support a deposition under Rule 45 to occur in that scenario.

Rather, the facts in the matter before this Court more closely parallel those presented in *Glaxosmithkline* and *Mylan*. Dr. Schaefer is not alleged to have participated in the "substance of the wrongful act alleged in the lawsuit[s]," *i.e.*, the policy decision of the current Administration to adopt the Mattis Policy. *See Glaxosmithkline*, 2007 WL 1051759 at *3. She is not a "participant" and "cannot [] describe events which constitute the substance of the lawsuit[s]." *Id.* Her arguably relevant knowledge in this matter is as to the information that she obtained through her expert study of matters seemingly at issue in the underlying suits and "courts consistently have held that Rule 45(d)(3)(B)(ii) protects information that results from an expert's study." *Mylan*, 2018 WL 5043157 at *7 (characterizing "internal deliberations, communications, predictions, assessments, recommendations, research and analysis, projections, estimates, draft advice, and analyses" as information resulting from an expert's work). For these reasons, the Court concludes that the overwhelming majority of the testimony that the Government seeks from Dr. Schaefer is expert opinion testimony rather than factual testimony about the specific occurrences in dispute.

### ii. The Government seeks Dr. Schaefer's testimony regarding her previously formed opinions.

The Government asserts that it seeks Dr. Schaefer's testimony in order to explore the bases of her conclusions and the choices regarding methodology that she employed in preparation of the RAND Report. The second *Kaufman* factor thus weighs in favor of the Government because the Government is seeking her testimony regarding the opinions that she had already formed, as expressed in the RAND Report. *See Schering Corp.*, 1998 WL 552944 at *3. However, the fact that her testimony will primarily concern previously formed opinions is not sufficient, on its own, to demonstrate a substantial need for her subpoenaed testimony. *See id.* (concluding that there was no substantial need for the deposition testimony and quashing the

subpoena because comparable testimony could be obtained elsewhere); *Glenmede*, 1995 WL 752422 at \*4 (same).

### iii. The Government has not demonstrated that Dr. Schaefer is a "unique" witness or that it has a substantial need for her testimony.

The third and fourth *Kaufman* factors weigh convincingly in favor of Dr. Schaefer. It is true that she is a "unique" witness insofar as she was the lead researcher and author of the RAND Report, but this is insufficient to make her *the* unique *expert* competent to testify as to the Report's contents and conclusions. *See, e.g.*, *Schering Corp.*, 1998 WL 552944 at \*3 (quashing a subpoena directed to a nonparty witness that prepared a summary of nearly 2,000 pages of laboratory notebooks because "there [was] no reason why another willing expert could not perform the same exercise and arrive at his or her own opinion"). The RAND Report discloses the data and methodologies that it relies upon in scrupulous detail. (Tr. at 18:15–19:7; Schaefer Dec., Exh. A at 106–12 (listing all of the cited references in the RAND report)). As noted previously, *see supra*, note 5, it is a "meta study," in essence a study based on existing data and research, and not the result of discrete fact-gathering by Dr. Schaefer. The Government has not asserted, let alone demonstrated, that it is unable to find its own expert to opine on the conclusions, methodologies, or soundness of the RAND Report. To the contrary, the Government has already done so, and admitted as much in its briefing in opposition to this Motion. (ECF No. 21 at 21). The February 2018 Department of Defense Memorandum (prepared with contributions from a "panel of experts" convened by then-Secretary Mattis) proposing the Mattis Policy discusses and critiques the RAND Report and the studies that it relies upon. (Gunn Dec. ¶ 7, Exh. F at 1–2, 41–43). These experts were ready and able to render their own opinions about the RAND Report without further contributions from Dr. Schaefer.

The Government's primary asserted "need" for the expert opinion testimony it seeks from Dr. Schaefer related to her drafting and preparation of the RAND report is to "test the conclusions in the RAND report." (*E.g.*, Tr. at 61:3–7). This argument is unconvincing for the purposes of Rule 45(d)(3)(B)(ii). The reality that the Government—through the freely accessible and publicly available RAND report—will have complete access to the same studies and data that Dr. Schaefer did in formulating her opinions and conclusions in the RAND Report forecloses any argument that the Government has a "substantial need" (or anything close to it) for Dr. Schaefer's testimony, *see* Fed. R. Civ. P. 45(d)(3)(C)(i), in order to "test the conclusions" of the RAND Report. *See In re Nat'l Hockey League*, 2017 WL 1493671 at *8 (rejecting a party's asserted "need" for subpoenaed information and raw data where experts had access to sufficient data and information to formulate counter opinions);[6] *Rosa*, 2009 WL 2382760 at *2 (holding that there was no substantial need to depose the author of a report where the report disclosed the relied-upon sources and methodology); *see also Plough Inc. v. Nat'l Acad. of Sci.*, 530 A.2d 1152, 1159 (D.C. Ct. App. 1987) ("There is no lack of cases holding that where a party is furnished with the raw factual data in a civil case, no prejudice can result to the party who can

---

[6] The facts of *National Hockey League* are also analogous in certain key respects to those presented here. The defendant, the National Hockey League ("NHL"), served subpoenas on a nonparty research institution seeking documents related to, among other things, pre-publication discussions and data related to a report authored by a nonparty researcher. 2017 WL 1493671 at *2–*3. The report was important to the plaintiffs' claims in the underlying multi-district litigations, as the report concerned the causative association between repetitive head trauma and chronic traumatic encephalopathy ("CTE"). *Id.* at *1. The crux of the plaintiffs' claims was that the NHL failed to inform its players about the dangers of repetitive head trauma and the risks of developing CTE. *Id.* The *National Hockey League* court refused to enforce a motion to compel production of the pre-publication academic research materials for several reasons, several of which present themselves in this matter. The NHL could not demonstrate the requisite need for the information because it could obtain its own experts to refute the nonparty report's unfavorable conclusions (and had already identified authors who had done so), that non-public pre-publication data was irrelevant because it could not have informed what the NHL knew about CTE and what it allegedly withheld from the players, and that the report at issue was not the only source of information on the head trauma-CTE association. *Id.* at *8–*10. In this matter, the Government has likewise identified experts that can opine on issues of transgender healthcare and military policy, (ECF No. 21 at 21), and the RAND Report is clearly not the only source of information on these topics since the Report itself discloses numerous studies and data that it analyzed and relied upon, (Schaefer Dec., Exh. A at 106–12). The Government in this case has also not put forward a basis as to why any pre-publication information about the Report is relevant, as it appears to this Court that only the contents of the final RAND Report are cited and/or relied-upon by any of the plaintiffs or courts in the underlying litigations.

have his or her own experts assess that factual information.") (collecting cases) (internal quotations and alterations omitted); *cf. Daggett v. Scott*, No. 15-00065, 2015 WL 3407314, at *3 (D. Colo. May 26, 2015) (permitting the deposition of a nonparty, unretained expert to occur because the expert's report did not disclose the underlying facts or methodologies employed).

If the Government wants to "test the conclusions in the RAND report," it can, of course, retain its own experts to utilize their own knowledge, skill, experience, training, or education to analyze the data and sources that Dr. Schaefer and her team did, and then affirm or critique the Report. And, the Government has not demonstrated that Dr. Schaeffer is a "unique" expert in the sense that the Government could find no other expert with the requisite knowledge, skill, experience, training, or education to render an expert opinion given the data that Dr. Schaefer relied upon in the RAND Report. *Cf. Walker v. Blitz*, No. 5:08MC15, 2008 WL 5210660, at *4 (N.D. W. Va. Dec. 12, 2008) (concluding that there was a substantial need for the testimony of an unretained expert because the expert had knowledge concerning certain "flame arrestors in portable gasoline containers [that was] *unavailable* from *any* other source") (emphasis added).

Experts retained or consulted by the Government may employ different methodologies than those employed by Dr. Schaeffer if they determine, based on their knowledge, skill, experience, training, or education, that it would be appropriate to do so. The Government's experts might well reach different conclusions than Dr. Schaefer and her team did. These experts could then generate their own reports to refute any alleged deficiencies in Dr. Schaeffer's Report. Under the Federal Rules of Civil Procedure and the essentially uniform caselaw on this subject, *that* is how the conclusions in the RAND Report are to be tested.

Instead, what the Government, in sum and substance, wants to do here is "test" Dr. Schaefer's conclusions by probing Dr. Schaefer as to how she arrived at the ultimate opinions

and conclusions in the RAND Report throughout the drafting process of the Report. Thus, the purpose for this deposition is either to seek to impeach the final RAND Report and the conclusions and analyses therein by impeaching Dr. Schaefer and the processes she used, or to make Dr. Schaefer the Government's expert witness via her opinion testimony and against her wishes. Impeaching an adverse opinion is completely legitimate—the Government is simply seeking to go about it in a manner inconsistent with Rule 45. "[T]o the extent that the [Government] finds Dr. [Schaefer's] opinion inconsistent" with its experts, the Government "is free to draw comparisons and attempt to impeach Dr. [Schaefer] on that basis." *See Nat'l Hockey League*, 2017 WL 1493671 at *8; *see also Cusumano v. Microsoft Corp.*, 162 F.3d 708, 712, 717 (1st Cir. 1998) (upholding the district court's quashing of a subpoenas *duces tecum* directed to a nonparty researcher seeking pre-publication research documents "for purposes akin to impeachment"). The Government already has everything that it needs to impeach the RAND Report via other experts from the Report itself. (*See* Schaefer Dec., Exh. A at 106–12). And, the text of Rule 45 itself demonstrates why the Government cannot compel Dr. Schaefer to become its expert witness absent the compelling circumstances that the Rule requires.

The Government also argues that it has a substantial need for Dr. Schaefer's testimony because the RAND Report is ambiguous. The Court is unpersuaded. To the extent that any portion of the Report is unclear or ambiguous,[7] the Government is free to retain and utilize its own expert to opine on these alleged ambiguities. *See Rosa*, 2009 WL 2382760 at *3; *Nat'l Hockey League*, 2017 WL 1493671 at *8. And, "[i]f the [RAND report's] methodology is lacking, as [the Government] alleges, it will only help [the Government] discredit the [report's] unfavorable conclusions." *Rosa*, 2009 WL 2382760 at *2.

---

[7] The Court expresses no opinion on this issue.

iv.  Dr. Schaefer's concern about being called to provide additional subpoenaed testimony is not a factor at this juncture.

The fifth *Kaufman* factor does not weigh in favor of either party at this time. Dr. Schaefer has authored other reports regarding other high-profile issues, (Schaefer Dec. ¶ 12), and she has expressed concern that enforcing the subpoenas here will expose her to the possibility of being deposed in any subsequent case in which one of her reports may be relied upon for a challenged policy decision. Dr. Schaefer's concerns have merit insofar as it seems reasonably likely, in the Court's estimation, that the situation presented here could repeat itself, given Dr. Schaefer's expertise and line of work and the mission of RAND itself. That is, it seems quite plausible that one of Dr. Schaefer's reports could be material in a hypothetical future litigation challenging a significant policy decision and Dr. Schaefer could once again find herself on the receiving end of a Rule 45 subpoena. That said, these concerns are mitigated because whether compliance with a subpoena would unduly burden a nonparty is a fact-specific inquiry in each case. *See Nat'l Hockey League*, 2017 1493671 at \*9–\*11. And, more importantly, Dr. Schaefer's concerns, though facially legitimate, strike the Court as insufficiently certain at this juncture to tip the scale. Dr. Schaefer has not represented to the Court that she has received any additional subpoenas or has a specific reason at this time to believe that she will. Accordingly, the fifth *Kaufman* factor does not weigh in favor of either party.

v.  Dr. Schaefer would be unduly burdened in being compelled to testify as to the single non-opinion topic identified by the Government.

Item 10 in the Government's Notice seeks information on Dr. Schaefer's presentations to the Department of Defense, *i.e.*, "exploring what occurred during these presentations, and whether any changes were made to drafts of the report following these presentations and the reasoning behind any changes to the draft report as it evolved." (ECF No. 29 ¶ 10). Any

testimony regarding the "reasoning behind any changes to the draft report as it evolved" would be unretained expert testimony for the reasons already discussed at length. The balance of the testimony sought in Item 10 (as to what was said at the meetings with the Department of Defense officials and content of any changes to the drafts), while partially factual in nature, is of questionable relevance, and critically, the Government has failed to demonstrate that it has any need for this information *from Dr. Schaefer*.

Discovery burdens are assessed in relation to their expected benefit. *See, e.g.*, *Glaxosmithkline*, 2007 WL 1051759 at \*4. And, "[t]he burden encompasses both the personal hardship to the subpoenaed party and the wider social consequences of permitting discovery." *In re Fosamax Prods. Liability Litig.*, No. 06-1789, 2009 WL 2395899, at \*3 (S.D.N.Y. Aug. 4, 2009) (citing *Solarex Corp. v. Arco Solar, Inc.*, 121 F.R.D. 163, 169 (E.D.N.Y. 1988)). Here, the Government has not identified (let alone shown a need for) any relevant *factual* information or testimony that it seeks from Dr. Schaefer that it could not obtain from the RAND Report itself or from past or present Department of Defense officials.

The Government asserted that "[t]here have been changes in the drafts of the report as it evolved," including some changes in numbers used, and therefore the Government needs to depose Dr. Schaefer because only she "can testify as to why these changes were made" and the Government "can't develop [its] argument that the RAND report shouldn't be relied on" without her testimony. (Tr. at 58:12–22). The Court is unconvinced by the argument that changes made in preliminary drafts of the Report would justify a deposition of the Report's author under Rule 45. The Court harbors doubt as to the relevancy of the draft reports and the evolution of the drafts, as it appears that the parties and courts have only cited or discussed the final RAND Report in any of their analyses. The Government has not provided any basis as to why the

unpublished drafts themselves, or any changes to them, would be relevant to the issues presented in the underlying litigations, or are even discoverable since draft expert reports are defined by Rule as outside the scope of civil discovery absent the demonstration of both "substantial need" and "undue hardship" necessitating such disclosure. *See* Fed. R. Civ. P. 26(b)(4)(B) (referencing Fed. R. Civ. P. 26(b)(3)(A), (B)). And, the Court can discern no other reason for why the Government seeks this otherwise generally undiscoverable information other than to impeach Dr. Schaefer's final Report and the findings and conclusions in it. As explained above, the Government can impeach the RAND report by utilizing its own experts, especially since all of the relied-upon studies and data are disclosed in the Report. (Schaefer Dec., Exh. A at 106–12).

But even if this information were relevant, the Government has failed to demonstrate why it must depose Dr. Schaefer to obtain information regarding the meetings with Department of Defense officials or the content of any changes to drafts, and has demonstrated neither "substantial need" nor "undue hardship" in such regards. Counsel for Dr. Schaefer represented at Oral Argument that there were a number of other individuals at those meetings—including agents and employees of the Department of Defense. (Tr. at 13:6–18). Moreover, counsel for Dr. Schaefer provided the Court with the names of two individuals who were personally present at those meetings and who have already been deposed by the Government. (*Id.* at 14:6–15:4). The Government did not controvert either representation. It thus appears to the Court that the Government could readily obtain—or already has obtained—testimony regarding the content of these meetings (and has similar access to the factual content of versions of drafts of the Report shared with Government officials) that it now seeks without having to hale Dr. Schaefer into these cases unwillingly. That Dr. Schaefer has chosen to remain outside of these litigations, and has thus far taken firm actions to do so, weighs further in favor of a conclusion that the burdens

imposed on her would be disproportional to the marginal or minimal benefit that the Government may derive from her testimony. *See Think Fin.*, 2018 WL 4635750 at \*2 (listing "the [subpoena] recipient's status as a non-party" as a relevant consideration in determining whether compliance with a subpoena would impose an undue burden on the recipient); *Fosamax*, 2009 WL 2395899 at \*3 ("In general, third parties are afforded more sympathy in weighing the burden of discovery because they have no personal stake in the litigation.").

Dr. Schaefer has also identified several burdens that she would endure if she were to comply with these subpoenas. Among other things, she asserts that her professional reputation, and RAND's by extension, would be harmed if she were forced to comply with the subpoenas because Dr. Schaefer's professional reputation relies upon conducting her work in an objective, independent, and nonpartisan manner. In Dr. Schaefer's view, being forced into these litigations through a compelled deposition could give the impression that she and/or RAND had "taken sides," which could give the appearance of bias. (Schaefer Dec. ¶¶ 9–10). Dr. Schaefer has provided ample support for this position, including a declaration from the Vice President and Director of RAND's National Security Research Division. (Riley Dec., ECF No. 4). Relatedly, Dr. Riley expresses institutional concerns on behalf of RAND. (*Id.*). Dr. Riley explains that RAND's reputation for objective and unbiased research could be called into question, and the specter of Dr. Schaefer being forced to testify in contentious litigation could chill further research into sensitive and consequential issues. (*Id.* ¶¶ 12–16). These reputational and institutional concerns are certainly supportive of a conclusion that Dr. Schaefer would be unduly burdened by being forced to testify. The Court finds these concerns to be legitimate and compelling, and also notes that several courts have credited such concerns of similar academic and research organizations in quashing subpoenas directed to nonparty researchers. *See, e.g.,*

*Fosamax*, 2009 WL 2395899 at \*3 ("Compelling testimony from a third party researcher risks chilling participation in beneficial public research.") (collecting cases).[8]

The Government is overly dismissive of these arguments in claiming that Dr. Schaefer is merely being asked to provide truthful testimony. Such a characterization ignores the fact that the Government will be asking the questions at a deposition and almost certainly framing them in a strategic manner to advance its litigation position—to defend the Mattis Policy—in part by "test[ing] the conclusions in the RAND report and show[ing] that this evidence isn't really intentioned the way that the plaintiffs argue that it is." (*See* Tr. at 61:3–7). As mentioned, the panel of experts convened by the current Administration's Department of Defense rejected and critiqued several conclusions of the RAND Report in proposing the Mattis Policy. (Gunn Dec. ¶ 7, Exh. F at 1–2, 41–43). Thus, in order to defend that Policy, the Government will presumably be seeking to elicit testimony from Dr. Schaefer that discredits her own Report or otherwise calls its conclusions into question, placing the Government in an offensive posture as against Dr. Schaefer. It is far more than merely conceivable that this could generate the perception that Dr. Schaefer would be aligned with the plaintiffs in the underlying suits or, at minimum, be adverse in some regards to the Government if she defends her own work.

Dr. Schaefer and RAND have also acted consistently with these concerns in the underlying litigations, as Dr. Schaefer has declined to testify on behalf of or be deposed by any of the parties in the underlying litigations, including any of the plaintiffs. (Ross Dec. ¶¶ 2–4; Tr. at 11:12–12:19). The Court need not and does not opine as to whether the burdens identified by Drs. Schaefer and Riley would be undue had the Government demonstrated the requisite need for

---

[8] The Government asserts, without citation to authority, that "public policy is not a factor considered by courts in this Circuit in ruling on motions to quash." (ECF No. 21 at 19). The Court is unaware of any Third Circuit authority that so holds. To the extent that it may be unsettled in this Circuit whether courts may consider public policy in determining whether a subpoena imposes an undue burden, this Court agrees with those courts endorsing such considerations. *E.g.*, *Fosamax*, 2009 WL 2395899 at \*3.

Dr. Schaefer's testimony. But here, because the Government has failed to demonstrate any such need for Dr. Schaefer's testimony, the Court concludes that compliance with the subpoenas would subject Dr. Schaefer to an undue burden. *See Am. Fed. of Musicians v. Skodam Films, LLC*, 313 F.R.D. 39, 44–45 (N.D. Tex. 2015) (listing non-exhaustive factors to be considered in an undue burden analysis, including "the relevance of the information requested," "the need of the party for the documents," "the burden imposed," and "the expense and inconvenience to the non-party") (internal quotations omitted).

The Government next argues that public policy favors enforcing the subpoenas because these underlying cases involve "the composition of the military and national security concerns." (ECF No. 21 at 19). The Court acknowledges that the underlying cases are undoubtedly important ones for any number of reasons. However, the magnitude of the issues in the underlying cases does not change the reality that the Government has failed to demonstrate the requisite need for Dr. Schaefer's testimony under a plainly applicable federal procedural rule and consistently uniform caselaw from other courts applying that rule. The Government's argument boils down to a concern that it will be unable to mount the defense it wants to in these cases, but as the Court has explained at length, the Government has not demonstrated that such concerns pass the test of the federal civil rules for compelling Dr. Schaefer's expert testimony.

The conclusion that the Government has not demonstrated the requisite need for Dr. Schaefer's testimony is further bolstered by the fact that she is the author of a Report that, at this moment, does not appear to this Court to be admissible evidence in any of the underlying litigations for the truth of the matters asserted in the Report. *See* Fed. R. Evid. 801(c), 802.[9] Dr.

---

[9] The Court has not identified any exception under Federal Rules of Evidence 803 or 804 that would render it admissible, and counsel for the Government could not either when asked by the Court at Oral Argument. (Tr. at 51:15–54:12).

Schaefer represented in her papers, and reiterated at Oral Argument, that she will not voluntarily testify in any of the litigations or lay the foundation to offer the Report into evidence. (*E.g.*, Tr. at 29:23–30:2). The Government represented at Oral Argument that it was unsure whether it would even object to the admissibility of the Report in any of the upcoming merits trials (should the cases proceed to that stage), despite several members of the Government "trial team" participating in the Oral Argument. (*See, e.g.*, Tr. at 65:23–66:12). Instead, the Government belabored the point that other courts have "relied upon" the RAND Report in some of their decisions. *See, e.g.*, *Karnoski*, 2018 WL 1844464 at *3–*4.[10]

First, this Court recognizes that other courts have acknowledged that the prior Administration and the plaintiffs in the underlying litigations relied upon the RAND Report's assertions and conclusions, but it does not appear to the Court that any of the other courts have relied upon the truth of the statements in the RAND Report in rendering their decisions. For example, the Government frequently asserted in this Court that the *Karnoski* court "relied upon" the RAND report in its summary judgment decision. (*E.g.*, Tr. at 60). That is not accurate. The *Karnoski* court noted that officials in the prior Administration commissioned RAND to prepare the Report, summarized some of the Report's conclusions, and also explained how former Secretary Carter and others considered the Report in formulating the Carter Policy. 2018 WL

---

[10] That the RAND Report was possibly considered by any of the courts in issuing rulings on the plaintiffs' request for preliminary injunctive relief in any of the underlying cases has no bearing on whether the RAND Report will ultimately be admissible at trial in those litigations. "It is well established that a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)) (internal quotation marks omitted). As such, most Circuits—including the Ninth and Fourth—recognize that otherwise inadmissible hearsay evidence may be considered in determining whether to grant preliminary injunctive relief. *See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016), *vacated and remanded on other grounds*, 137 S. Ct. 1239 (2017); *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). It appears likely to this Court that the D.C. Circuit would reach a similar conclusion, given that all Circuits to have explicitly considered the issue have done so. *See Gloucester Cty.*, 822 F.3d at 725 (holding that "district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted" and collecting cases from the First, Second, Third, Fifth, Seventh, Ninth, and Eleventh Circuits reaching similar conclusions).

-24-

1784464 at *3–*4. The *Karnoski* court did not, however, in this Court's estimation, *itself* rely upon any of the statements in the RAND Report for the truth of the matters asserted in making its conclusions as to the merits of the claims before it in that case. *Id.* at *10–*13. In fact, the *Karnoski* court cited a variety of sources *and other experts* in discussing the material facts in that case. *Id.* This tends to undercut the Government's position that Dr. Schaefer's testimony is unique and/or vital to the Government's defense. It is true that some of those experts relied on Dr. Schaefer's Report in rendering their expert opinions, (*see, e.g.*, Exh. C, ECF No. 143, *Karnoski*, No. 17-1297 (W.D. Wash. filed Aug. 28, 2017)), but this also tends to hurt rather than help the Government's position. Presumably these other experts were able to analyze Dr. Schaefer's Report and draw their own conclusions from it without deposing Dr. Schaefer. As explained above, there is nothing stopping the Government from obtaining their own experts to do the same, as would be the typical and appropriate course of action. *See, e.g.*, *Rosa*, 2009 WL 2382760 at *2; *Nat'l Hockey League*, 2017 WL 1493671 at *8.

Second, even if other courts had relied on the RAND Report for the truth of the matters asserted in it, it does not appear that the Government has objected to any of the plaintiffs' or courts' purported reliance on the RAND Report pursuant to Federal Rule of Civil Procedure 56(c)(2) or otherwise. (Tr. at 54:5–12, 61:7–23, 62:7–21). So, here is the situation as the Court sees it. The Government wants to depose Dr. Schaefer, now, because she authored a Report that the prior Administration found influential and relied upon, among other things, in formulating the Carter Policy. The current Administration has seemingly disagreed with one or more conclusions of the RAND Report, among other things, in formulating the Mattis Policy and has identified its own experts who substantiate its policy decisions. Plaintiffs challenging the Mattis Policy cite to and discuss the RAND Report, among other things, in presenting their cases. The

Government apparently did not object to them doing so. Other courts referred to the RAND Report in their opinions in discussing how policymakers did or did not consider it. It does not appear as if any court has directly relied upon the RAND Report for the truth of any of the matters asserted in the RAND Report. No basis has been advanced by the Government as to how the RAND Report will be admissible in any of the upcoming trials, and curiously, the Government told this Court at Oral Argument that it does not even now know if it will object to its admissibility if it is offered at a merits proceeding in those cases.[11]

But yet, despite all of that, the Government now claims that it must depose Dr. Schaefer—a nonparty from whom the Government seeks almost entirely expert opinion testimony, despite her Report disclosing its sources, data, and methodologies—and must depose her now because other courts have cited to the RAND Report in resolving preliminary injunction and summary judgment motions. This argument may have had more force had the Government challenged any aspect of any other courts' reliance on the RAND Report, or represented that it planned to challenge the Report's admissibility at trial on the merits in those courts. Rather, it appears to the Court that the Government is now seeking somewhat extraordinary relief in order to remedy an evidentiary predicament that has not at all ripened, and/or that the Government itself has allowed to evolve.[12]

---

[11] Of course, as a logical matter, if the Government is not going to object to the Report's admissibility on the merits in the underlying cases, then it makes it even more likely that the Government is in reality seeking to use Dr. Schaefer's deposition testimony as expert trial testimony in those cases against her will.

[12] The Government also expressed a fear that an expert called by a plaintiff in one of the underlying cases might (1) rely on the RAND Report, and (2) testify as to its content. Of course, that can only happen if the Report's otherwise hearsay content is admitted over the Government's objection at trial because the trial court concludes that the probative value of that "other" expert testifying as to the content of the RAND Report substantially outweighs its prejudicial effect. Fed. R. Evid. 703. At this juncture, that rather speculative fear of an adverse evidentiary ruling way down the line is too thin a reed to make out the requisite need required by Rule 45 to force Dr. Schaefer to testify at a deposition now.

-26-

The Government also stated several times during Oral Argument that Dr. Schaefer's deposition testimony is necessary because other courts *might* continue to rely upon the RAND Report, or that the RAND Report *might* be introduced as evidence at trial, or that even if the Government were to challenge the RAND Report's admissibility, a court *might* not rule in the Government's favor. In short, the Government's asserted necessity for Dr. Schaefer's deposition relies in significant measure on multi-layered uncertainty and speculation. While it is possible that further developments in the underlying cases may necessitate that this Court revisit this issue, for now, the Court concludes that the Government has failed to demonstrate that it has a need—substantial or otherwise—for Dr. Schaefer's compelled expert deposition testimony. The Court further concludes that Dr. Schaefer would be unduly burdened by having to comply with the subpoenas at this juncture because the professional and reputational burdens that she would incur would disproportionally outweigh the relevance of, and the Government's asserted need for, her deposition testimony.

\* \* \*

## IV.    CONCLUSION

For the foregoing reasons, Dr. Schaefer's Motion to Quash (ECF No. 1) will be GRANTED and the subpoenas issued to Dr. Schaefer will be quashed. An appropriate Order will issue, without prejudice as to the position of any party advancing a motion to modify the Order for good cause shown based on subsequent or intervening events.

Mark R. Hornak
Chief United States District Judge

Dated: June 3, 2019

cc:    All counsel of record